**04-5972-bk(L)**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————————

August Term, 2004

(Argued: September 19, 2005                    Decided: June 16, 2008)

Docket No. 04-5972-bk(L), 04-6300-bk(XAP)

—————————

In re: CBI HOLDING COMPANY, INC.,

*Debtor,*

—————————

BANKRUPTCY SERVICES, INC.,

*Plaintiff-Appellant-Cross-Appellee,*

—v.—

ERNST & YOUNG, ERNST & YOUNG LLP,

*Defendants-Appellees-Cross-Appellants.*

—————————

Before:

WINTER, SOTOMAYOR, and WESLEY,

*Circuit Judges.*

—————————

Appeal from two orders of the United States District Court for the Southern District of New York (Wood, *J.*), entered on June 30, 2004 and October 25, 2004, vacating in full the judgment of the United States Bankruptcy Court for the Southern District of New York (Lifland, *J.*) and directing final judgment in favor of Defendants.

AFFIRMED in part, REVERSED in part, and REMANDED.

―――――――

JAY G. STRUM, Kaye Scholer LLP (Arthur Steinberg, Robert B. Bernstein, Elisabeth C. Kann, *on the brief*), New York, NY, *for Plaintiff-Appellant-Cross-Appellee.*

ANDREW L. FREY, Mayer, Brown, Rowe & Maw LLP (Sandford I. Weisburst, Mayer, Brown, Rowe & Maw LLP; Richard F. Broude, P.C.; and Irwin J. Sugarman, Harry S. Davis, Schulte Roth & Zabel LLP, *on the brief*), *for Defendants-Appellees-Cross-Appellants.*

―――――――

WESLEY, *Circuit Judge*:

In August 1994, CBI Holding Company, Inc. and all but one of its subsidiaries (collectively, "CBI") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Ernst & Young and Ernst & Young LLP (together, "E&Y"), the pre-bankruptcy accountants for CBI and Defendants-Appellees in this action, filed a Proof of Claim against CBI in those proceedings for allegedly unpaid auditing and consulting services. On August 23, 1995, the United States Bankruptcy Court for the Southern District of New York (Lifland, *J.*) confirmed a Plan of Reorganization ("the Plan") and appointed Bankruptcy Services, Inc. ("BSI"), the Plaintiff-Appellant in this action, the disbursing agent of the Plan. On October 16, 1996, BSI filed a complaint in the bankruptcy court, followed by an amended report on October 25, 1996, pressing seven claims against E&Y concerning the professional services E&Y rendered to CBI from 1992 to 1994. BSI brought each of the seven claims as the successor to the claims of CBI under the Plan (collectively, "the CBI claims"). Pursuant to a settlement contained in the Plan, BSI also brought four of these claims as the assignee of the claims that Trust Company of

the West ("TCW") acquired as a pre-bankruptcy creditor of CBI (collectively, "the TCW claims"). Finally, BSI also brought one claim – for expungement of E&Y's Proof of Claim – as the assignee of an objection to E&Y's Proof of Claim filed by the Official Unsecured Creditors' Committee ("Creditors' Committee"). On April 5, 2000, the bankruptcy court granted judgment for BSI on six of its seven claims, *see Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*), ("*CBI I*" or "Bankruptcy Opinion"), 247 B.R. 341 (Bankr. S.D.N.Y. 2000), and later awarded BSI approximately $70 million in damages. In two orders entered on June 30, 2004, *see Ernst & Young v. Bankr. Servs., Inc.* (*In re CBI Holding Co.*) ("*CBI II*" or "June Order"), 311 B.R. 350 (S.D.N.Y. 2004), and October 25, 2004, *see Ernst & Young v. Bankr. Servs., Inc.* (*In re CBI Holding Co.*) ("*CBI III*" or "October Order"), 318 B.R. 761 (S.D.N.Y. 2004), the United States District Court for the Southern District of New York (Wood, *J.*)[1] vacated the judgment of the bankruptcy court, and directed judgment in E&Y's favor, on the grounds that: (1) the fraudulent acts of CBI's management must be imputed to the company itself, thereby depriving BSI of standing to press the CBI claims; and (2) BSI lacks standing to assert the TCW claims under *Barnes v. Schatzkin*, 215 A.D. 10 (1st Dep't 1925). BSI appeals from each of these grounds. We agree and reverse.

We hold that BSI has standing to assert the CBI claims under the so-called "adverse interest" exception to the normal rule that a claim against a third party for defrauding a corporation with the cooperation of its management accrues to creditors rather than to the guilty corporation. The bankruptcy court's finding that CBI's management "was acting for its own

---

[1] The Honorable Kimba M. Wood of the United States District Court for the Southern District of New York became Chief Judge on August 1, 2006.

interest and not that of CBI" is not clearly erroneous and constitutes the "total abandonment" of a corporation's interests necessary to satisfy the adverse interest exception. We also hold that BSI has standing to assert the TCW claims because revisions to the bankruptcy laws have undermined the rationale of *Barnes* for the reasons set forth in *Semi-Tech Litigation, L.L.C. v. Ting*, 13 A.D.3d 185 (1st Dep't 2004).

Because we reverse, we must reach the two arguments that E&Y raises in its cross-appeal: (1) BSI's claims are not "core proceedings" that may be adjudicated by a bankruptcy judge; and (2) E&Y is entitled to a jury trial on all of BSI's claims. We reject both arguments. We hold that all of the claims pressed by BSI – both the CBI claims and the TCW claims – are "core proceedings," because they are covered by the language of 28 U.S.C. § 157(b) and are integrally related to the Proof of Claim that E&Y voluntarily submitted against the estate. Similarly, we hold that while both parties now agree that E&Y is entitled to a jury trial on the TCW claims, E&Y waived its right to a jury trial on the CBI claims when it submitted its Proof of Claim against the estate and subjected itself to the equitable powers of the bankruptcy court. Moreover, under the rule announced by the Supreme Court in *Katchen v. Landy*, 382 U.S. 323 (1966), there is no need to vacate the portions of the bankruptcy court's judgment which relate to the CBI claims merely because the portions of the judgment which relate to the TCW claims have been vacated to allow for a jury trial.

## BACKGROUND

### I.[2]

---

[2] The bulk of this section derives from the bankruptcy court's findings of fact. See *CBI I*, 247 B.R. at 347-62, for further details.

*The parties.* CBI was a large wholesale distributor of pharmaceutical products. Its business consisted primarily of purchasing pharmaceutical products from manufacturers and warehousing those products for delivery to entities such as retail pharmacies and hospitals, which in turn sold the products to end users. CBI's President and Chairman was Robert Castello. Castello had an employment agreement with CBI in which he was eligible for an annual bonus in an amount tied to the company's net earnings.

To remain competitive, CBI undertook in the early 1990s a strategy of growth by acquisition. It financed these acquisitions in two ways. First, it borrowed capital from a bank syndicate through a series of lending agreements. These agreements included specific financial targets – including an earnings to fixed charge ratio, a net worth ratio and other standard covenants – that CBI had to meet in order to be eligible for additional credit and to avoid default on its existing loans. Moreover, the agreements limited the credit available to each subsidiary of CBI in terms of actual dollars and as a fixed percentage of inventory and accounts receivable. To monitor attainment of the specified targets, the banks required CBI to provide an array of monthly, quarterly, semiannual and annual reports detailing the company's earnings, inventory and receivables, and to certify in connection therewith its compliance with the agreements' various covenants. Second, it acquired capital from TCW, which invested in CBI in May 1991 and again in April 1993. In May 1991, TCW invested $20 million in exchange for $5 million in CBI common stock and $15 million in corporate notes. As a result of this investment, TCW acquired 48% of CBI, while Castello retained 52% of the company. In April 1993, TCW invested an additional $750,000 in CBI in exchange for a note with a face value of $750,000 and $250,000 worth of CBI common stock.

Through its initial investment, TCW also acquired various rights set forth in a shareholders agreement (the "Shareholders Agreement") and a securities purchase agreement (the "Securities Agreement"). Most importantly, TCW acquired the right to select two of the five members of CBI's Board of Directors and one of the three members of the Board's Audit Committee, while Castello retained the Presidency and Chairmanship of CBI as well as the right to select the Board's and Audit Committee's remaining members. TCW's two seats on the Board were filled by Frank Pados and, by 1993, Brian Mahoney.

TCW also acquired the right to take control of CBI in the event of the occurrence of a "control triggering event." The Shareholders Agreement defined control triggering events to include (1) a breach of the earnings to fixed charge ratio specified in the Securities Agreement, and (2) a failure to pay the principal on TCW's corporate notes, whether such payment was due at maturity or by reason of acceleration. The Securities Agreement permitted TCW to accelerate CBI's note payment schedule in the event of certain defaults, including the making of any unauthorized loan to a CBI officer (*e.g.*, Castello).

E&Y became CBI's independent auditors in June 1990. E&Y performed audits of CBI's financial statements for fiscal years 1990 to 1993, and in 1994 began a re-audit of CBI's 1993 financial statements. In addition to serving as independent auditors, E&Y also received substantial fees for performing supplemental mid-year reviews and due diligence procedures related to CBI's acquisitions.

*The fraud.* It is undisputed that Castello and certain other members of CBI's management engaged in a scheme to deceive the company's lenders, including TCW, as to CBI's true financial condition during fiscal years 1992 and 1993. The fraudulent scheme consisted

primarily of inventory fraud, which took three principal forms.

First, CBI's management delayed the recording of invoices – that is, CBI's management intentionally failed to record invoices during the fiscal year in which purchases were made and/or goods were received. Since CBI had to continue to pay its vendors in order to continue to receive merchandise, management would round up the amounts owed as payments to the vendors and classify the amounts paid as "advance" payments. Advance payments are usually considered assets and recorded as such on the balance sheet, but in this case E&Y's work papers indicate that the advance payments were treated as reductions to "accounts payable." Because the invoices were never recorded as accounts payable on CBI's balance sheet, the scheme reduced accounts payable twice: once when the invoice was not added to accounts payable, and once when the amount actually paid was subtracted from accounts payable as an "advance." Additionally, the inventory to which these invoices pertained was apparently included on the balance sheet as assets. It is undisputed that this aspect of the scheme helped CBI generate falsely inflated earnings, which, in turn, improved the company's earnings to fixed charge ratio (preventing default on the bank loans and on the TCW loan) and inflated Castello's bonus.

Second, CBI's management created fictitious inventory, which was then included in the calculation of the company's total assets. This aspect of the scheme increased the amount of inventory available as collateral for CBI's bank loans, thus increasing the amount of money that CBI was able to borrow from the banks, and may also have affected the company's earnings.

Third, CBI's management engaged in "paper" transfers of inventory between subsidiaries – that is, when a subsidiary of CBI reached the borrowing limit on its bank loans given its actual inventory, CBI's management would falsely indicate that inventory had been transferred from

other subsidiaries which had more inventory, in order to allow the maxed out subsidiary to continue to borrow. This aspect of the fraud had no effect on CBI's consolidated financial statements, but allowed CBI's subsidiaries to skirt the loan agreements' borrowing caps.

Castello also defrauded CBI with regard to his annual bonuses. He took a bonus based on CBI's falsely inflated net earnings for fiscal year 1992, which he knew was greater than that to which he was entitled. He also took a portion of his falsely inflated bonus for fiscal year 1993 prior to entitlement.

The question at the heart of this appeal is whether the above-described fraudulent scheme was intended solely to benefit its perpetrators personally or whether those perpetrators also had CBI's interests in mind.

*The audits.* E&Y issued unqualified audit opinions with respect to CBI's financial statements for fiscal years 1992 and 1993 on August 6, 1992 and October 26, 1993, respectively. For both of those years, E&Y's opinions stated that E&Y conducted its audit in accordance with Generally Accepted Accounting Standards ("GAAS") and that, in the opinion of E&Y, the consolidated financial statements presented fairly, in all material respects, the financial position of CBI. In fact, the financial statements prepared by E&Y did not fairly present CBI's financial position because E&Y did not detect certain unrecorded liabilities when it performed the audits. In March 1994, E&Y acknowledged that CBI's 1993 financial statements were materially inaccurate and withdrew its October 23, 1993 opinion. Also in March 1994, E&Y commenced additional procedures related to the financial statements of CBI for fiscal year 1993 (the "re-audit"). E&Y never completed the re-audit; in July 1994, CBI directed it to cease all audit-related activities.

**II.**

*The bankruptcy proceeding.* In August 1994, CBI filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. In January 1995, E&Y filed a Proof of Claim against CBI in those proceedings in the amount of $210,850 for allegedly unpaid auditing and consulting services. The Proof of Claim states that the claim "arises from professional services rendered in 1993 and 1994 on behalf of [CBI] in connection with the audit of [CBI]'s financial statements and other special engagements." In June 1995, the Creditors' Committee filed an Objection to certain claims filed in CBI's bankruptcy action, including E&Y's claim. The objection does not allege malpractice, but states that it is "without prejudice to the Committee's right to object to the within proofs of claim on other grounds as may be necessary."

By order dated August 23, 1995, the bankruptcy court confirmed the First Amended Joint Plan of Reorganization of Creditors' Committee and CBI. Pursuant to the Plan, Castello's equity interest in CBI was extinguished, and BSI was appointed Disbursing Agent for the Debtors' estates and charged with the responsibility of distributing the estates' assets to their creditors. CBI also granted BSI "the right to pursue and prosecute . . . all adversary proceedings and contested matters pending or thereafter commenced or filed in the Bankruptcy Court or elsewhere, including . . . any and all objections to claims." The Plan also contained a settlement of the potential claims between CBI and TCW: TCW was granted an allowed claim of $16.7 million against the estates; CBI was "deemed to have waived and released any and all claims . . . against TCW"; and TCW "transferred and assigned to the Disbursing Agent, any and all rights to pursue and prosecute causes of action of any kind held by TCW against any third party, in its capacity as a Creditor or equity security holder of any of the Debtors."

On October 25, 1996, the Creditors' Committee and BSI entered into an assignment under which the Creditors' Committee expressly assigned to BSI its "right, title and interest to pursue and prosecute all adversary proceedings and contested matters pending as of the Effective Date of the Plan or thereafter commenced or filed in the Bankruptcy Court or elsewhere including, without limitation, the Litigations and objections to claims, inclusive of the Objection to the claim of E&Y."

*The adversary proceeding.* On October 16, 1996, BSI, in its capacity as the Disbursing Agent under the Plan, filed a complaint in bankruptcy court against E&Y. On October 25, 1996 – after the express assignment of the Creditors' Committee claims – BSI filed an amended complaint concerning the professional services rendered by E&Y to CBI from 1992 to 1994. Specifically, the amended complaint alleges: (1) breach of contract in connection with the fiscal 1992 and 1993 audits; (2) negligence in connection with the fiscal 1992 and 1993 audits; (3) negligent misrepresentation that the fiscal year 1992 and 1993 financial statements were materially accurate and that E&Y conducted the fiscal 1992 and 1993 audits in compliance with GAAS; (4) fraud and/or recklessness in connection with the fiscal 1992 and 1993 audits; (5) fraud and/or recklessness in inducing Debtors to retain E&Y to perform the re-audit; (6) breach of fiduciary duty in failing to make certain disclosures to CBI; and (7) expungement of E&Y's $210,850 Proof of Claim. BSI brought each of the seven claims as the successor to the claims of CBI under the Plan. BSI also brought the second, third, fourth and fifth claims as assignee of the claims that TCW acquired as a creditor of CBI, pursuant to the settlement contained in the Plan. Finally, BSI also brought the seventh claim as the assignee of the Creditors' Committee's Objection.

Soon after BSI filed its amended complaint, E&Y moved to withdraw the adversary proceeding from bankruptcy court to the United States District Court for the Southern District of New York (Wood, *J.*). By order dated November 13, 1998 ("1998 Order"), the district court denied that motion, concluding that the adversary proceeding qualified as a "core proceeding" under 28 U.S.C. § 157(b)(2), and specifically as a "counterclaim" under § 157(b)(2)(C) and as a proceeding concerning the "allowance or disallowance of claims against the estate" under § 157(b)(2)(B). The court based that conclusion on its determination that the Proof of Claim and the claims in the amended complaint "are related, arise out of the same transaction, and a determination of [BSI's] claims would likely be dispositive of E&Y's claims." The court also found that the claims were core proceedings under the "catch-all" provisions of § 157(b)(2)(A) ("matters concerning the administration of the estate") and (O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims"). On August 13, 1999, the court denied E&Y's motion for re-argument and reconsideration of its order.

On May 4, 1999, BSI withdrew the demand for a jury trial contained in its amended complaint; the next day, E&Y filed its answer to that complaint and demanded a jury trial. On September 3, 1999, the bankruptcy court held that E&Y had waived its right to a jury trial when it "voluntarily participated in the equitable reordering of [CBI's] estates by filing a proof of claim," because all of the claims BSI presses against E&Y "are an 'inextricable part' of the allowance or disallowance of E&Y's claim against the[] estates and the adjustment of the debtor-creditor relationship."

*The bankruptcy court's opinion.* On April 5, 2000, after a seventeen-day bench trial on

-11-

the issue of liability, the bankruptcy court granted judgment for CBI on its first through fifth and seventh claims.[3] *CBI I*, 247 B.R. at 369. The court's opinion does not discuss each of BSI's claims separately, but concludes that: E&Y departed from GAAS, the accepted standards of practice for auditors, in conducting the fiscal year 1992 and 1993 audits of CBI's financial statements; and that E&Y's departure was the proximate cause of injury to CBI and TCW. *See id.* at 362-64. The court also rejected each of the four grounds on which E&Y moved to dismiss (some or all of) BSI's claims, holding that: (1) the imputation doctrine does not deprive BSI, as the successor in interest of CBI, of standing to assert its claims against E&Y; (2) the relationship between E&Y and TCW was close enough for TCW (and BSI acting on TCW's behalf) to assert negligence-based claims against E&Y (and, alternatively, that TCW would have standing to assert a common law fraud claim); (3) BSI's claims are not barred under New York's three-year statute of limitations; and (4) the TCW claims are not barred by New York General Obligations Law § 15-108(c). *See id.* at 364-69.

The court rejected E&Y's "imputation defense" – that "as the successor in interest to CBI," BSI lacks standing to pursue the CBI claims "because the knowledge of certain CBI officers . . . who were involved in the . . . fraud must as a matter of law be imputed to CBI itself and would therefore bar CBI from contending that it was deceived by the erroneous financial statements that E&Y certified" – on two grounds. *See id.* at 364-65.

---

[3] The bankruptcy court previously dismissed BSI's sixth claim, for breach of fiduciary duty. *CBI I*, 247 B.R. at 346. The court did not specifically mention BSI's seventh claim for expungement of E&Y's Proof of Claim in its opinion, but noted that it granted judgment for CBI "on all remaining counts." *See id.* at 369. Moreover, in its November 6, 2000 judgment, the bankruptcy court stated that it found "with respect to Count VII[,] that [E&Y's] proof of claim in the bankruptcy proceeding in the amount of $210,850 should be expunged."

-12-

First, the court concluded that although management's knowledge is usually imputed to the company itself, BSI still had standing to press the CBI claims under the widely accepted "adverse interest" exception to such imputation. *Id.* at 365 (citing *Sec. Investor Prot. Corp. v. BDO Seidman LLP*, 49 F. Supp. 2d 644, 650-51 (S.D.N.Y. 1999)). The court explained that "the knowledge of company management involved in a fraud will not be imputed to the company itself if such management was acting totally for its own interest and not that of the corporation." *Id.* The court reasoned that because "as demonstrated in the Findings of Fact, the evidence showed that the fraud was perpetrated for the purpose of obtaining a bigger bonus for Castello, and to preserve Castello's personal control over the company," management's knowledge should not be imputed to CBI "because the segment of management involved in the fraud was acting for its own interest and not that of CBI." *Id.* Although the court did not identify on which factual findings it based this conclusion, earlier in its opinion, under the heading "Facts Bearing on Inapplicability of Doctrine of Imputation," it found as a matter of fact that "[a] principle [sic] reason why . . . members of CBI management caused liabilities to remain unrecorded at year-end was not for any corporate purpose but rather to ensure that Castello received the maximum possible bonus and remained in control." *Id.* at 360.

Second, the court endorsed another exception to the normal rule of imputation, the so-called "innocent insider" exception, *see id.* at 364-65, recognized by a number of courts in the Southern District of New York, *see, e.g.*, *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 212 B.R. 34, 35-36 (S.D.N.Y. 1997). The court explained that "a corporation whose management was involved in an accounting fraud is not barred from asserting claims for professional malpractice in not detecting the fraud, provided the corporation had at least one

-13-

decision-maker in management or among its stockholders who was innocent of the fraud and could have stopped it." *CBI I*, 247 B.R. at 364-65 (citing *BDO Seidman*, 49 F. Supp. 2d at 649-51). Referring to its earlier findings of fact, the court reasoned that because "TCW was innocent of the fraud, and one of its representatives on CBI's board of directors, Frank Pados, testified that had he known of the fraud, he would have taken steps to stop it[,] . . . the wrongdoing on the part of CBI's management is not imputable to CBI itself." *Id.* at 365.

The court also rejected E&Y's claim that its relationship with TCW was not close enough to permit TCW to hold it responsible for any of its negligence or fraud with respect to CBI's financial statements. *Id.* at 365-66. The court explained that, under New York law, three criteria "must be met in order to hold accountants liable in negligence to non-contractual parties who rely to their detriment on inaccurate financial reports:"

> "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance."

*Id.* at 366 (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)). The bankruptcy court then recounted seven of its findings of fact that it concluded "demonstrated . . . [that] each of the *Credit Alliance* factors was satisfied" in the instant case. *Id.* The court also held that "even if the *Credit Alliance* factors had not been met, TCW would still have standing to assert a claim based on a theory of common law fraud." *Id.*

By order dated April 18, 2000, the bankruptcy court scheduled a trial on damages. After a second bench trial, the bankruptcy court determined damages of $27,738,603, plus pre-judgment interest of nearly $17,000,000, with respect to the CBI claims, and damages of

-14-

$15,412,000, plus pre-judgment interest of nearly $10,000,000, with respect to the TCW claims. The court found the appropriate measure of damages suffered by CBI to be the difference in the amount for which its equity could have been sold in 1993 and $0 (CBI's value at the time the Plan was entered on August 23, 1995). The court found the appropriate measure of damages suffered by TCW (as a creditor of CBI) to be the amount it would have received on its $15.75 million in notes if CBI had been sold in October 1993.

*The district court's orders.* E&Y appealed the bankruptcy court's decision to the United States District Court for the Southern District of New York (Wood, *J.*) on a number of grounds. On June 26, 2004, the district court issued an opinion and order affirming in part and reversing in part the decision of the bankruptcy court. *CBI II*, 311 B.R. at 355. The court affirmed the bulk of the bankruptcy court's decision, including: the basis of its jurisdiction (which relied on the district court's conclusion in its 1998 Order that the CBI and TCW claims were all core), *see id.* at 362-63; its finding that E&Y waived its right to a jury trial on the CBI claims, *see id.* at 365-66; its finding that BSI has standing to assert CBI's negligence and breach of contract claims notwithstanding E&Y's imputation defense, *see id.* at 373-76; its finding that BSI has standing to assert TCW's fraud claim, *see id.* at 376; and its rejection of E&Y's other affirmative defenses, *see id.* at 377. However, the district court reversed the bankruptcy court's finding that E&Y was not entitled to a jury trial with respect to the TCW claims. *See id.* at 366-67. As a result of that reversal, the district court pointed out that BSI had standing to assert TCW's negligence claims only if a jury found (as the bankruptcy court had) that the *Credit Alliance* factors were satisfied.[4]

---

[4] As noted before, the court agreed with the bankruptcy court that BSI could assert TCW's fraud claims against E&Y.

*See id.* at 376. The court also ordered the parties to provide additional briefing on whether its conclusion that E&Y is entitled to a jury trial on the TCW claims necessitated a new trial on the CBI claims as well. *Id.* at 377-78. The court indicated that the resolution of that question would render moot some, if not all, of the outstanding issues on appeal. *Id.*

The district court declined to resolve the question of whether BSI has standing to assert CBI's fraud claims in light of E&Y's proffered imputation defense. *Id.* at 377. The court explained that, "[t]he bankruptcy court's decision states a number of times that the segment of management involved in the fraud was acting in its own interest and not acting in CBI's interest," and that "[t]he bankruptcy court stated, specifically, that the purpose of the fraud was to obtain a bigger bonus for Castello, and to preserve Castello's personal control over CBI." *Id.* at 370. The district court concluded that, "[t]hese statements . . . support the bankruptcy court's conclusion that the adverse interest exception applies, and that imputation is therefore inappropriate." *Id.* However, the court expressed some reservations regarding the language utilized by the bankruptcy court:

> [I]n its findings of fact, the bankruptcy court suggested (perhaps inadvertently) that there existed at least one purpose for the fraud other than to obtain a bigger bonus for Castello, and to preserve Castello's personal control over CBI: The bankruptcy court stated in its findings of fact that "[a] *principle* [sic] reason why . . . members of management caused liabilities to remain unrecorded at year-end was *not for any corporate purpose* but rather to ensure that Castello received the maximum bonus and remained in control." This language leaves open the possibility that the bankruptcy court found that some corporate purpose was served by the fraud.

*Id.* (internal citation omitted and alterations in original). However, the court did explicitly "decline[] to adopt any innocent insider exception" to the normal rule of imputation, because

"misconduct by those given authority to make decisions on behalf of a company should be imputed to the company even if innocent members of management could and would have prevented the fraud had they been aware of it." *Id.* at 372.

On July 8, 2004, E&Y filed a motion for rehearing, in which it asked the district court: to rule on the previously unresolved question of whether BSI has standing to assert CBI's fraud claims under the adverse interest exception to imputation; to reconsider its earlier holdings that BSI has standing to assert CBI's negligence and breach of contract claims, and TCW's fraud claims; and to rule on the question – previously deferred to a jury – of whether BSI has standing to assert TCW's negligence claims. On October 26, 2004, the district court granted the motion for rehearing, resolved each of the four issues raised in E&Y's motion in defendants' favor, vacated in full the judgment of the bankruptcy court, and directed the clerk of the court to enter final judgment in favor of E&Y. *CBI III*, 318 B.R. at 763, 767.

In holding that BSI lacks standing to assert CBI's fraud claims against E&Y, the district court reversed the bankruptcy court's conclusion that "CBI's managers 'totally abandoned' CBI's interests" when they committed their fraudulent acts on four grounds. *Id.* at 763-65. In so doing, the district court gave no indication that it was according the bankruptcy court's factual finding any deference.

First, the district court criticized the sufficiency of the evidence that the bankruptcy court cited in support of its finding of total abandonment:

> The exhibit upon which [the bankruptcy court] relie[d] is a vaguely worded schedule regarding the financial scenario that would need to occur "to reach 100 percent of bonus." The text of the exhibit was found by an [E&Y] employee, on the computer used by John O'Brien, the former Controller of CBI. Although BSI and the Bankruptcy Court below treat this document as evidence of the intention

-17-

of CBI's managers in defrauding the company, [E&Y] correctly points out here that the Bankruptcy Court declined to admit this document for that purpose, because the document was not authenticated. There is no testimony by O'Brien concerning the document; there is no indication of who created the document and for what purpose it was created. There is thus no basis to conclude that the document provides any evidence of O'Brien's intent in participating in the scheme to defraud CBI.

*Id.* at 764 (internal citations and footnotes omitted).

Second, the court discredited the testimony of Brian Mahoney, a former accounting supervisor at CBI, which BSI pointed to as other record evidence supporting the bankruptcy court's finding. The gist of Mahoney's testimony was that "[John] O'Brien told him that the 'real reason' for failing to record liabilities and for overstating CBI's income was to ensure that Castello received his maximum bonus." *Id.* at 764-65. The district court explained that "[e]ven if Mahoney's testimony, which is clearly hearsay, were admissible as an exception to the hearsay rule, its probative value is slight, in view of Mahoney's testimony immediately thereafter that he had no way of knowing whether O'Brien had some other purpose in mind for failing to record liabilities." *Id.* at 765.

Third, the district court held that the bankruptcy court should have drawn an adverse inference "from the fact that BSI chose not to offer any testimony by Paul Rogers, CBI's former senior financial officer," because Rogers, "allegedly a central figure in the fraud, . . . [who] possessed first-hand knowledge about the 'real reason(s)' for the fraud," was available as a witness to CBI via his court approved settlement agreement. *Id.*

Finally, following its own review of the record, the court found "some evidence that various corporate purposes were served by the managers' acts of fraud" *besides* inflating Castello's bonus. *Id.* For instance, the court found that "CBI's managers hid invoices and left

-18-

certain liabilities unrecorded in order to give false representations of CBI's profitability to lending banks, without which CBI would have risked triggering an event of default." *Id.*

The district court then reversed its earlier holding that, "regardless of whether BSI has standing to sue [E&Y] for defrauding CBI, BSI has standing to assert CBI's negligence and breach of contract claims" on the grounds that because "[t]he factual allegations giving rise to CBI's negligence and breach of contract claims are virtually identical to the allegations giving rise to CBI's fraud claims[,] . . . [t]he claims assert 'a single form of wrongdoing under different names' for purposes of the standing analysis." *Id.* at 765-66.

Finally, the court reversed its earlier holding that BSI had standing to assert TCW's claims on the grounds that it had "overlooked controlling law, which holds that a bankruptcy trustee does not have standing to assert claims against third parties on behalf of creditors of a corporation, even where the creditors assigned their claims to the trustee." *Id.* at 766 (citing *Bredeen v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)* ("*Bennett*"), 336 F.3d 94, 102 (2d Cir. 2003)). *Bennett*, the case cited by the district court for this proposition, cites in turn to a line of cases that originates with *Barnes v. Schatzkin*, 215 A.D. at 10. *Bennett*, 336 F.3d at 102. The court reasoned that because the Second Circuit has consistently followed *Barnes* and BSI has been treated as analogous to a bankruptcy trustee throughout these proceedings, BSI does not have standing to assert claims on behalf of TCW. *CBI III*, 318 B.R. at 767.

## DISCUSSION

BSI now presses two main arguments on appeal. First, BSI argues that it has standing to

assert the CBI claims, because the district court erred in finding the adverse interest and innocent insider exceptions inapplicable, and therefore in imputing the fraudulent acts of members of CBI's management to CBI. BSI argues that, in the alternative, its claims based on E&Y's conduct in connection with the 1994 re-audit are meaningfully distinct from its claims based on management's fraud, and therefore it has standing to assert the re-audit claims even if management's wrongdoing is imputed to CBI. Second, BSI argues that it has standing to assert the TCW claims because *Barnes* is no longer good law and is distinguishable from the instant case. We agree that BSI has standing to assert all of CBI's claims under the adverse interest exception to the normal rule of imputation. Thus, we need not address BSI's arguments regarding the innocent insider exception and the 1994 re-audit.[5] We also agree that BSI has standing to assert the TCW claims. To the extent that *Barnes* interprets federal law, it is not binding on this Court. We find that, in light of the subsequent inclusion of § 541(a)(7) in the Bankruptcy Code, *Barnes*' reasoning is no longer persuasive. We therefore must reach the two arguments that E&Y presses on cross-appeal: first, that none of BSI's claims are core proceedings that may be adjudicated by a bankruptcy judge; and, second, that the district court erred in holding that E&Y was not entitled to a jury trial on the CBI Claims. We reject both.

**I**

---

[5] Judge Wood's analysis of the innocent insider exception and its likely genesis as a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception is extremely persuasive. *See CBI II*, 311 B.R. at 372-73; *see also* Jonathan Witmer-Rich & Mark Herrmann, *Corporate Complicity Claims: Why There is No Innocent Decision-Maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation*, 74 Tenn. L. Rev. 47, 59-80 (2006).

Does BSI have standing to assert the CBI claims against E&Y notwithstanding the role CBI's management played in the fraud? Under New York law, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir. 1991). Because a bankruptcy "trustee stands in the shoes of the bankrupt corporation" and can maintain only those actions that the debtors could have brought prior to the bankruptcy proceedings, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage." *Id.* at 118; *see also Mediators, Inc. v. Manney* (*In re The Mediators, Inc.*), 105 F.3d 822, 826 (2d Cir. 1997) (applying same analysis to creditors committee "suing on behalf of the debtor").

"[B]reach of contract, negligence, and fraud, when committed by auditors, are a single form of wrongdoing under different names," and therefore, under the logic of *Wagoner*, a bankruptcy trustee does not have standing to bring any claims related to professional malpractice in the context of cooperative wrongdoing between the debtor and its auditors. *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982); *see also Wedtech Corp. v. KMG Main Hurdman* (*In re Wedtech Corp.*), 81 B.R. 240, 241 (S.D.N.Y. 1987) (reaching this conclusion in the context of claims brought under New York law). Thus, in *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995), we held that a trustee lacked standing to sue a bankrupt corporation's auditors "for professional malpractice on the basis that activities undertaken by the[] [auditors] to effectuate . . . scheme[s aimed at defrauding creditors] *also* impacted adversely upon" the corporation, where the corporation collaborated with the auditors "in promulgating and promoting the . . . schemes." *Id.* at 1094 (applying the *Wagoner* rule under Connecticut law).

"The rationale underlying the *Wagoner* rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000). This principle is itself based "on the presumption that an agent [will normally] discharge[] his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency," and thus any misconduct engaged in by a manager is with – at least – his corporation's tacit consent. *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) (internal quotation marks omitted). "Under New York law, the adverse interest exception rebuts th[is] usual presumption . . . ." *Mediators*, 105 F.3d at 827. "Under the exception, management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight*, 219 F.3d at 87. The theory is that "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, . . . he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Center*, 66 N.Y.2d at 784 (citations omitted). However, New York courts have cautioned that this exception is a narrow one and that the guilty manager "must have totally abandoned" his corporation's interests for it to apply. *Id.* at 784-85.

There is no dispute that, if the *Wagoner* rule applies, BSI lacks standing to assert CBI's claims against E&Y for fraud, negligence and breach of contract in connection with its 1992 and 1993 fiscal audits. Members of CBI's management committed various acts of fraud that E&Y failed to uncover during the two audits. If the acts of those individuals, and the knowledge of the fraud possessed by those individuals, can be imputed to CBI itself, then BSI – standing in CBI's shoes – cannot sue E&Y for its role in the fraud. Thus, the parties' dispute focuses solely on

whether any exception to the *Wagoner* rule bars such imputation. We find that the adverse interest exception is satisfied, and thus that BSI has standing to pursue the CBI claims.

**A**

Our review of orders issued by a district court "in its capacity as an appellate court is plenary." *Giaimo v. DeTrano* (*In re DeTrano*)*,* 326 F.3d 319, 321 (2d Cir. 2003). "The factual determinations and legal conclusions of the Bankruptcy Court are, therefore, reviewed independently by this Court." *Denton v. Hyman* (*In re Hyman*), 502 F.3d 61, 65 (2d Cir. 2007). The bankruptcy court's factual conclusions are reviewed for clear error, while its legal conclusions are reviewed de novo. *Id.*

A factual finding is not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Notwithstanding Appellees' contention to the contrary, in reviewing factual findings for clear error, an appellate court is not confined to evidence cited in a lower court's opinion, but must instead review all of the record evidence. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see also Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1098 (2d Cir. 1988).

**B**

The bankruptcy court's conclusion that "the [imputation] doctrine [is] rendered inapplicable by virtue of the 'adverse interest' exception because the segment of management involved in the fraud was acting for its own interest *and not that of CBI*" was based on its factual finding that "the fraud was perpetrated for the purpose of obtaining a bigger bonus for Castello,

and to preserve Castello's personal control over the company" and its legal understanding that "[u]nder the 'adverse interest' exception, the knowledge of company management involved in a fraud will not be imputed to the company itself if such management was *acting totally for its own interest and not that of the corporation.*" *CBI I*, 247 B.R. at 365 (emphasis added). This explanation leaves no doubt that the bankruptcy court concluded *as a matter of fact* that CBI's management had totally abandoned CBI's interests as required for the "adverse interest" exception to be satisfied, *see id.* at 360, notwithstanding the muddled "principle [sic] reason" language highlighted by the district court, *see CBI II*, 311 B.R. at 370. Thus, the only question is whether the bankruptcy court's factual finding of total abandonment is clearly erroneous. *See Hyman*, 502 F.3d at 65. We conclude that it is not.

The most important piece of record evidence that supports the bankruptcy court's finding is Mahoney's testimony. Mahoney, a former accounting supervisor at CBI, testified that he was told by O'Brien, CBI's former Controller, that "the real reason" for the fraud was to maximize Castello's bonus. He testified that he had multiple conversations over the period of the fraud with O'Brien and Paul Rogers, CBI's former senior financial officer, in which he was instructed as to the exact procedure to follow in order to "overstate" CBI's income to reach the "gross profit percentage" necessary "for Mr. Castello's bonus to be met." His fraudulent activity came only at the direction of O'Brien and Rogers. He also testified that he was "not aware of" any motivations for the fraud besides Castello's bonus.

Appellees argue that the district court was correct to dismiss Mahoney's testimony as lacking in probative value, because "when asked 'whether Mr. O'Brien had other purposes in mind for reaching the gross profit percentage besides the reason he gave you,'" Mahoney testified

that he didn't "'know if [O'Brien] had other ideas.'"[6] Thus, Appellees contend that "Mahoney's testimony was completely non-probative on the central question posed by the adverse-interest exception: [D]id the managers *totally* abandon the Company's interests or were they '*simultaneously* serving their own interests and the company's interests'?"

Mahoney's testimony, however, is clearly probative of this central question: Mahoney, one of the key figures in the scheme, had himself *totally abandoned* CBI's interests when he engaged in the fraudulent activity and was convinced that the rest of the guilty members of CBI's management had done the same. While the bankruptcy court might have elected to infer from Mahoney's testimony that there actually *were* other reasons for the fraud, it was clearly not required to draw such an inference. "In reviewing findings for clear error, [an appellate court is] not allowed to second-guess . . . the trial court's . . . choice between permissible competing inferences. Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous." *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003) (internal citation omitted). Moreover, given that Appellees provide no evidence that O'Brien had reason to conceal his intention to benefit CBI while revealing his more illicit motive for the fraud, the inference advanced by Appellees has little support in the record.

Indeed, Appellees point to only one piece of direct evidence for the proposition that CBI's

_____

[6] Although the district court also deemed Mahoney's testimony "clearly hearsay," *see CBI III*, 318 B.R. at 765, Appellees now concede that it is admissible under the rule that "the opponent whose question calls in advance for obviously inadmissible evidence has thereby waived objection to the answer, and he cannot object if the other party subsequently makes use of the very evidence that he has elicited." 1 *Wigmore on Evidence* § 18, at 336 (Chadbourn rev. 1981). E&Y called Mahoney as an adverse witness and asked Mahoney about his conversations with O'Brien and Rogers repeatedly.

management had mixed motives for the fraud: the testimony of Louis Scerra, an auditor at E&Y, regarding a conversation he had with Frank Pados, TCW's principal representative on the CBI Board, in March 1994. In other words, Appellees provide only one piece of evidence that directly contradicts the inference of total abandonment that the bankruptcy court drew from Mahoney's testimony.[7] Scerra testified that Pados told him that the fraud was designed to "help the company prosper, grow, increase in value." Appellees contend that this testimony is "unchallenged and unrebutted."

However, the bankruptcy court expressly found Scerra's testimony to be "evasive, lacking in credibility, or both." *CBI I*, 247 B.R. at 359. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two . . . witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575. Thus, to the extent that the bankruptcy court's finding of total abandonment rests on its decision to credit Mahoney's testimony rather than Scerra's, its finding is not clearly erroneous.

Moreover, the record contains external evidence that the bankruptcy court could have interpreted as contradicting Scerra's testimony: the bonus schedule that Scerra found on O'Brien's computer and faxed to Mahoney, a CBI Board member, in April 1994. The schedule shows the "additions" to the various inputs on CBI's balance sheet for April 1993 necessary "to

---

[7] The district court found that the bankruptcy judge should have drawn an adverse inference from the fact that BSI did not offer testimony from Rogers, CBI's former senior financial officer, regarding the motivation for the fraud. *CBI III*, 318 B.R. at 765. Appellees do not press this argument on appeal. In any case, application of the missing witness rule by a trial court is subject to an abuse of discretion standard, which the district court failed to apply. *See Felice v. Long Island R.R. Co.*, 426 F.2d 192, 194-95 (2d Cir. 1970).

-26-

reach 100 percent of bonus." The document was admitted by the bankruptcy court only for the limited purpose of determining what was in Scerra's mind when he faxed it. It is not direct evidence that Castello's bonus motivated CBI's management. However, in keeping with the hearsay-limited purpose of the bonus schedule, the bankruptcy court could have inferred from the fact that Scerra sent the schedule to a member of CBI's Board that Scerra had concluded that the fraud's purpose was to benefit Castello personally. Thus, the court could have concluded that Scerra's testimony – that he had been told nearly a month before he sent the fax that the fraud was actually to benefit CBI – was not credible.

Appellees also echo the district court's conclusion that the "record contains some evidence that various corporate purposes were served by the managers' acts of fraud, at least some of which were distinct from the issue of Castello's bonus." *CBI III*, 318 B.R. at 765. Specifically, Appellees argue that "CBI had a direct interest in deceiving the banks concerning both quarterly and year-end earnings" in order "to avoid a default" and that "the inflated quarterly figures [CBI's management] . . . presented to the banks . . . had no effect on Castello's bonus or control." According to Appellees, "[t]hese facts render[] it impossible to find (as New York law requires) that the financial dishonesty was for *no purpose other than* to secure Castello's bonus and maintain his control." This argument fails for at least three reasons.

First, it is important to remember that the "total abandonment" standard looks principally to the intent of the managers engaged in misconduct. *See Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d 663, 666 (3d Dep't 1995) ("[T]he issue [is] whether mismanagement of [the company] was the vehicle by which [the manager] *intended* to advance his own interest or whether it was simply incidental to his continued efforts to retain some economic viability in the

-27-

company.") (emphasis added). Evidence that CBI *actually benefitted* from CBI's management's fraud does not make the bankruptcy court's finding that CBI's management did not *intend to benefit* the company clearly erroneous. Indeed, even where the purpose of a fraud was to continue a corporation past insolvency in order to give its management time "to resolve [the corporation's] underlying business problems, such a motivation does not . . . necessarily equate to a finding that the fraudulent actors intended to benefit [the corporation]. . . . [A] reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, . . . and reputations . . . ." *Phar-Mor, Inc. v. Coopers & Lybrand (In re Phar-Mor, Inc. Sec. Litig.)*, 900 F. Supp. 784, 787 (W.D. Pa. 1995); *see also Capital Wireless*, 216 A.D.2d at 666 (finding an issue for trial in applying the adverse interest exception where, although the "fraud generated much needed financing for plaintiff and forestalled its bankruptcy," the wrongdoer might still have totally abandoned the company's interest); *Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992) ("The fact that some of the embezzled money was put back into the corporation to help inflate sales and facilitate public offerings is not inconsistent with an abandonment by . . . [m]anagement of the corporation's interest.").

Second, the fraudulent scheme benefitted Castello in at least three ways: (1) by allowing him to maintain control of CBI even after CBI's actual financial results and an unapproved loan to Castello would have allowed TCW either to accelerate payment of its notes or to take control of CBI under the Shareholders' Agreement; (2) by avoiding default on CBI's loans from banks and vendors, which would have forced Castello to relinquish control of the company; and (3) by allowing him to collect two bonuses greater than would have been justified by earnings under his

contract, one of which was a prohibited loan because it was taken before he was entitled to it. Notwithstanding Appellees' adamant protests to the contrary, the three principal forms of inventory fraud engaged in by CBI's management helped Castello to secure at least one of these benefits.[8]

The first form of inventory fraud was the delayed recording of invoices. It is undisputed that this aspect of the fraud helped generate falsely inflated earnings for CBI. The inflation of CBI's earnings improved its earnings to fixed charge ratio, which allowed the company to avoid triggering note acceleration or a takeover under its Shareholders' Agreement with TCW, as well as to avoid defaulting on its bank loans. The inflated earnings also increased Castello's bonus.

The second form of inventory fraud was the creation of fictitious inventory. Mahoney testified that the purpose of this aspect of the fraud was to increase the amount of inventory available as collateral for CBI's bank loans. The fictitious inventory was also included in CBI's calculation of its total assets, which may have artificially reduced the cost of goods sold, and thus increased the apparent profit margin. Even if the fictitious inventory did not affect the earnings to fixed charge ratio, it still helped CBI to continue borrowing money from the lending banks and to avoid having its loans called. Had CBI's credit line from the banks been cut off and its loans

[8] Other aspects of the fraud received little attention in the parties' briefs: intentionally recording credits due to customers late in order to increase accounts receivable; artificially reducing the reserve for doubtful accounts; and falsely reporting the age of accounts receivable to the lenders to maintain the required collateral for bank loans. There is also no evidence in the record that any of these forms of fraud benefitted only CBI. Indeed, because the banks limited CBI's credit to a certain percentage of inventory and accounts receivable, like the second and third principal forms of inventory fraud discussed below, the primary effect of these aspects of the fraud would have been to increase CBI's ability to borrow, thus allowing Castello to retain control of the company.

called, Castello would have lost control of CBI to TCW (one event that triggered note acceleration or a takeover under the Shareholders' Agreement was a failure to pay off the note on schedule) and his fraud would have been exposed.

The third form of inventory fraud was "paper" transfers of inventory between CBI subsidiaries, which allowed those subsidiaries to borrow past their bank-imposed inventory-based loan limits. Again, this aspect of the fraud increased CBI's cash flow, which was essential to Castello retaining control of the company.

Ultimately, it is clear that Appellees' claim that "the inflated quarterly figures . . . had no effect on Castello's bonus or control" ignores the reality of the complicated financial balancing act CBI's management performed to maintain Castello's increasingly tenuous control of CBI. By inflating CBI's quarterly figures, management maintained the veneer of profitability required to keep TCW and the banks at bay. Inflating CBI's quarterly figures was also a necessary step in the surreptitious creation of the false annual reports necessary for Castello to collect his maximum bonus – after all, it is difficult to imagine how convincing false annual reports could be created from accurate quarterly ones.

Third, the purported "benefits" that Appellees suggest CBI *itself* received as a result of management's machinations are illusory. "A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." *Bloor v. Dansker* (*In re Investors Funding Corp. of N.Y. Sec. Litig.*), 523 F. Supp. 533, 541 (S.D.N.Y. 1980). Prolonging a corporation's existence in the face of ever increasing insolvency may be "doing no more than keeping the enterprise perched at the brink of disaster." *Mirror Group Newspapers v. Maxwell*

*Newspapers, Inc.* (*In re Maxwell Newspapers, Inc.*), 164 B.R. 858, 869 (Bankr. S.D.N.Y. 1994). Even the "benefit" provided by "further indebtedness" – capital – "may provide an illusory financial cushion that lulls shareholders into postponing the decision to dissolve the corporation" and thus "miss an opportunity to cut their losses." *Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (internal quotation marks omitted). In this case, there is nothing speculative about the opportunity that CBI would have had to "cut its losses": Pados testified as to TCW's willingness to buy out CBI and the bankruptcy court found as a matter of fact that CBI would have sold for almost $28 million as late as October 1993. *See CBI II*, 311 B.R. at 360.

After reviewing the record as a whole, we find that the bankruptcy court's conclusion that "the segment of management involved in the fraud was acting for its own interest and not that of CBI" is not clearly erroneous. *See CBI I*, 247 B.R. at 365. Because this finding of total abandonment means the adverse interest exception to the *Wagoner* rule of imputation applies in this case, the guilty managers' acts and knowledge are not imputed to CBI.[9] As a result, BSI has standing to press the CBI claims against E&Y.

**II**

---

[9] Appellees argue that even if the adverse interest exception is satisfied, this court must determine if the "sole actor" rule – an exception to the exception – applies. *See Mediators*, 105 F.3d at 827. "This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." *Id.* Thus, the sole actor rule applies "where the principal and agent are one and the same" or, in the corporate context, where "the principal is a corporation and the agent is its sole shareholder." *Id.* The sole actor rule does not apply in this case because the CBI managers involved in the fraud were not the sole shareholders of the corporation, nor was there any finding that all shareholders were complicit in the fraud. On the contrary, the bankruptcy court found that TCW, which owned 48% of CBI's shares, was innocent of the fraud. *CBI I*, 247 B.R. at 365.

While BSI may assert CBI's claims against E&Y, several questions remain. One involves the claims of TCW and a New York case of a distant era: Does BSI have standing to bring the TCW claims against E&Y notwithstanding *Barnes v. Schatzkin*, 215 A.D. at 10?

In *Barnes*, the First Department of New York's Appellate Division held that a bankruptcy trustee could not, under § 70(a) and (e) of the then-existing Bankruptcy Act, take an assignment of a claim from a debtor's creditor against a third party and sue on that claim as a trustee. *Id.* at 10. The parties agree that BSI's assertion of the TCW claims depends on the type of assignment that *Barnes* forbids. Thus, they agree that if, as the district court found, *Barnes* is still good law in New York and applies to the facts of this case, then BSI lacks standing to assert the TCW claims. Appellant contends, however, that *Barnes* was overruled by the state court's subsequent decision in *Semi-Tech Litigation*, *L.L.C. v. Ting*, 13 A.D.3d at 185.

Both parties misread *Barnes.* Insofar as *Barnes* draws its understanding of the powers of the bankruptcy trustee from the then-existing Bankruptcy Act, it interprets federal – as opposed to state – law. As such, its holding is not binding on this Court. Moreover, much has changed since *Barnes* was decided. The now-recognized powers of a bankruptcy trustee to accept and protect property acquired after the commencement of bankruptcy proceeding have altered the equation. Although not bound by its decision, we agree with the reasoning set forth in *Semi-Tech*; intervening changes to federal bankruptcy law have undermined the rationale of *Barnes*. BSI has standing to assert the TCW claims under § 541(a)(7) of the modern Bankruptcy Code. *See* 11 U.S.C. § 541(a)(7).

**A.**

-32-

"In a bankruptcy proceeding, state law determines whether a right to sue belongs to the debtor or to the individual creditors." *Mediators*, 105 F.3d at 825 (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989)). Federal bankruptcy law "places a trustee in the shoes of the bankrupt corporation and affords the trustee standing to assert any claims that the corporation could have instituted prior to filing its petition for bankruptcy." *Id.* at 825-26 (citing 11 U.S.C. §§ 541, 542). Thus, to the extent that *Barnes* determined who owned the claims the trustee sought to assert, it was interpreting state law and its judgment binds us if still in force. *Cf. Statharos v. N.Y. City Taxi & Limo. Comm'n*, 198 F.3d 317, 321 (2d Cir. 1999) ("The ruling of an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (internal quotation marks omitted and second alteration in original). But insofar as *Barnes* turned on whether the assignment of those claims to the bankruptcy trustee was consistent with the powers of the trustee under federal bankruptcy law, its judgment is not controlling. *See Wojchowski v. Daines*, 498 F.3d 99, 110 n.9 (2d Cir. 2007).

In *Barnes*, the trustee for Cowley, a bankrupt partnership, sued "the defendants, members of the New York Stock Exchange" for "execut[ing] orders for Cowley . . . , knowing them to be conducting a bucket shop, and aid[ing] and abett[ing] in the [partnership's] fraud and . . . conversion." *Barnes*, 215 A.D. at 11. The trustee sued not on behalf of Cowley, who by the complaint's terms was primarily responsible for the fraud, but on behalf of the partnership's customers who "lost the equities in their several accounts" when Cowley went bankrupt, and who subsequently "assigned their several claims against the defendants to the plaintiff as trustee in bankruptcy of Cowley." *Id.* The defendants "moved to dismiss the . . . complaint on the grounds

that it appears upon the face thereof that the plaintiff has not legal capacity to sue." *Id.* at 10.

The court granted defendants' motion to dismiss on the grounds that a trustee of a bankrupt partnership had no capacity, under section 70 of the then-existing Bankruptcy Act, to sue on claims assigned to it by customers of the bankrupt. The court noted that, under New York law: "The claims on which the plaintiff seeks to recover were never part of the assets of [the bankrupt] nor did they arise in favor of the plaintiff as trustee in bankruptcy. They belonged to various creditors. . . . The claim pleaded arose, if at all, in favor of 164 . . . customers . . . ." *Id.* at 11. Thus, the court concluded: "If the trustee may take an assignment of these claims he might take an assignment of a claim from any stranger . . . . No such power appears to be given by the Bankruptcy Act." *Id.* at 12. The court explained:

> A trustee in bankruptcy has only such title and power as given by the Bankruptcy Act. He is a creature of that statute. No serious assertion is made here that [the assigned] claims . . . were property of the bankrupt. They were not assets which passed to the trustee because they belonged to the bankrupt. The [only] causes of action which the trustee has by reason of the Bankruptcy Act, other than such as were property of the bankrupt, are causes of action to recover or follow assets.
>
> . . . We are not concerned with a discussion of what might have been put into the National Bankruptcy Act; our concern is only with what it does contain.

*Id.* at 13.

The *Barnes* Court's reasoning is quite clear. New York law dictates that claims against a third party for defrauding a debtor's creditors with the help of the debtor accrue to those creditors rather than to the debtor. Thus, Cowley's trustee could not assert Cowley's customers' claims against the members of the New York Stock Exchange for aiding and abetting Cowley's fraud and conversion, because those claims belonged to Cowley's customers, not to its estate. Moreover,

the trustee could not assert those claims even though the customers assigned them to the trustee after Cowley's bankruptcy proceeding commenced, because then-existing federal law did not give trustees that power. *Barnes* has nothing to say with regard to whether the assignment would otherwise have been impermissible under state law.

In the instant case, the question before us is not whether TCW owns the claims (a matter of state law), but whether BSI can assert those claims as a result of a post-bankruptcy assignment from TCW. To the extent that the parties read *Barnes* as prohibiting the assignment in question, then, it is with regard to the decision's interpretation of a trustee's powers under *federal* law. Thus, *Barnes* does not bind us.

We are sympathetic to the parties' confusion on this point; this Court has not always clearly articulated the weight we have accorded various aspects of *Barnes*. However, notwithstanding Appellees' contention to the contrary, we have never adopted *Barnes*' interpretation of the powers of the bankruptcy trustee under federal law as the law of this Circuit.

The three decisions that Appellees cite in support of their contention are *Bennett*, 336 F.3d at 102, *Wight*, 219 F.3d at 86, and *Mediators*, 105 F.3d at 826. Not one of these cases involves an assignment of claims from a debtor's creditor to a bankruptcy trustee (or equivalent), and thus none of them can be said to "follow" the rule of *Barnes* at issue in this case. Moreover, in each of those opinions, the context in which *Barnes* is cited makes clear that this Court was not even reaffirming the relevant rule of *Barnes* in dicta. In *Bennett*, 336 F.3d at 102, and *Wight*, 219 F.3d at 86, *Barnes* is mentioned only as the original citation for language the opinions quote from

*Wagoner*,[10] and *Wagoner* specifically leaves open the question of when a bankruptcy trustee can assert claims on behalf of a debtor's creditors: "The trustee insists he is not asserting the claims of the noteholders, so it is unnecessary for us to delve deeply into when, if ever, a trustee may sue a third party on behalf of the bankrupt's creditors." 944 F.2d at 118. Similarly, in *Mediators*, the context in which *Barnes* is cited makes it clear that the court was not considering the application of *Barnes* to assigned claims: "A bankruptcy trustee has no standing *generally* to sue third parties on behalf of the estate's creditors . . . . Were the law otherwise, the debtor's assets would be depleted to enforce rights possessed by third parties, *see* [*Barnes*], and defendants would face the danger of duplicative recoveries." 105 F.3d at 826 (internal citations and quotation marks omitted) (emphasis added). Therefore, our cases do not support Appellees' claim that we have adopted the federal law aspect of *Barnes*.

---

[10] In *Bennett*, the court writes:

> Put another way, '[a] claim against a third party for defrauding a corporation with the cooperation of management, accrues to creditors, not to the guilty corporation.' *Wagoner*, 944 F.2d at 120. As the Court noted, 'even when defrauded creditors assigned to the trustee their claims against another for aiding and abetting the fraud the trustee lacked capacity to sue.' *Id.* at 118 (citing *Barnes v. Schatzkin*, 215 A.D. [at 13]).

> In short, we hold that the defrauded investors and not the bankruptcy trustee are entitled to pursue the claims arising from the fraud.

336 F.3d at 102 (alterations in original). Thus, even though the *Bennett* Court quotes *Wagoner*'s recitation of the relevant language from *Barnes*, it is only in the context of highlighting *Wagoner*'s rule of imputation.

In *Wight*, the Court does not refer to the relevant language from *Barnes*: "In [*Wagoner*], we ruled that under governing New York law, '[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.'" 219 F.3d at 86 (quoting *Wagoner*, 944 F.3d at 120 (citing *Barnes*)).

**B.**

Having concluded that *Barnes* is not binding on us, we must now determine whether we find its reasoning persuasive. We do not; its rationale has been undermined by the inclusion of § 541(a)(7) in the current Bankruptcy Code. *See* 11 U.S.C. § 541(a)(7). Indeed, the significance of § 541(a)(7) was recognized in *Semi-Tech* – by the same court that decided *Barnes*. *Semi-Tech*, 13 A.D.3d at 187; *see also Steinberg v. Kendig* (*In re Ben Franklin Retail Stores, Inc.*), 225 B.R. 646, 650 (Bankr. N.D. Ill. 1998) ("Even if the New York court's majority opinion were otherwise persuasive, the inclusion of § 541(a)(7) in the current bankruptcy code effectively overrules *Barnes*."). Thus, we now hold that federal bankruptcy law permits BSI to press the TCW claims against E&Y.

The plaintiff in *Semi-Tech* was an entity ("LLC") created pursuant to a plan of liquidation to bring actions on behalf of a bankrupt estate ("Semi-Tech"). The plan provided for the assignment of "Creditor Causes of Action" – certain claims held by creditors ("Noteholders") of Semi-Tech against third-parties – to LLC as part of a settlement between Semi-Tech and the Noteholders. After the plan was approved by the bankruptcy court, many Noteholders opted into the plan's settlement and assigned their claims to LLC. In *Semi-Tech*, LLC asserted a number of these assigned claims against Ernst & Young LLP and several of its affiliates. The complaint alleged that the Canadian office of Ernst & Young, which served as Semi-Tech's pre-bankruptcy auditor, injured Noteholders by failing to report a number of Semi-Tech's questionable transactions.

As Appellees do here, the defendants in *Semi-Tech* asserted that LLC did not have

standing to assert the assigned claims of the debtor's creditors against Ernst & Young under *Barnes*. The New York State Supreme Court disagreed:

> [T]he majority in *Barnes* based its reasoning on the Bankruptcy Law then in effect that had no provision permitting a trustee [to receive] property for the benefit of the estate . . . . Section 541(a)(7) in the current Bankruptcy Code clearly includes as property of the estate: "[a]ny interest in property that the estate acquires after the commencement of the case."

*Semi-Tech Litigation, LLC v. Ting*, Index No. 604644/2002, at 14 (N.Y. Gen. Term IAS Part 3 Mar. 24, 2004). The court concluded that, "given the current reading of the Bankruptcy Code, it is questionable whether *Barnes* remains good law" and held that LLC had standing to assert Semi-Tech's creditors' claims against Semi-Tech's auditor, Ernst & Young. *Id.*

The Appellate Division affirmed the Supreme Court's decision in relevant part. *Semi-Tech*, 13 A.D.3d at 187. The court noted that its earlier "decision in [*Barnes*], which was decided before [the 1978] revisions to the bankruptcy laws and which, in distinction to the present case involving an assignment by the Bankruptcy Court to a specially created entity, involved assignments by the individual creditors to the trustee, does not compel a different result." *Id.* (internal citations omitted).

Appellees acknowledge that if *Semi-Tech*'s view is applied to this case, BSI would have standing to assert the TCW claims. They do not dispute that the facts of this case replicate the facts of *Semi-Tech* almost exactly. Instead, Appellees argue we should not follow the decision for two reasons: first, the legislative history of the revisions to the Bankruptcy Code makes clear that Congress did not intend for those revisions to abrogate *Barnes*; and, second, the First Department's decision in *Semi-Tech* conflicts with the Second Department's decision in *P&F*

*Industries, Inc. v. Medallion Group, Inc.*, 102 A.D.2d 865 (2d Dep't 1984).  Neither of Appellees' arguments is persuasive.

First, Appellees point to the legislative history of the 1978 revisions to the Bankruptcy Code as evidence that Congress did not intend those revisions to abrogate *Barnes*.  In the same round of revisions in which Congress adopted § 541(a)(7) – the new section of the Code cited by the *Semi-Tech* Court as the basis for abrogating *Barnes* – Congress considered but rejected a proposed § 544(c).  Section 544(c) provided in relevant part:

> (1) The trustee may enforce any cause of action that a creditor [or] a class of creditors . . . has against any person, if – (A) the trustee could not recover against such person on such cause of action other than under this subsection; (B) recovery by the trustee for the benefit of such creditor . . . or the members of such class will reduce the claim or interest of such creditor or . . . [creditors] . . . against or in the estate; (C) there is a reasonable likelihood that recovery against such person will not create an allowable claim in favor of such person against the estate; and (D) enforcement of such cause of action is in the best interest of the estate.

*Mixon v. Anderson* (*In re Ozark Rest. Equip. Co.*), 816 F.2d 1222, 1228 n.9 (8th Cir. 1987) (quoting H.R. 8200, 95th Cong., 1st Sess. 416-17 (1977)).  Appellees argue that Congress could not have intended § 541(a)(7) to implicitly confer standing on bankruptcy trustees to assert the claims of a bankrupt's creditors, when, at the same time, it rejected a provision which would have explicitly conferred such standing.  *See also id.* at 1228 ("[B]ecause Congress refused to enact subsection (c), we believe Congress' message is clear – *no* trustee . . . has power under Section 544 of the Code to assert general causes of action . . . on behalf of the bankrupt estate's creditors.").

In reality, the rejected § 544(c) would have significantly broadened the trustee's power to assert creditors' claims when compared to the Appellate Division's interpretation of § 541(a)(7) in

-39-

*Semi-Tech.* Most importantly, it would have allowed a trustee to assert the claims of creditors without their assignment or permission. In explaining the import of the proposed § 544(c), the House Report stated:

> Subsection (c) is new. It overrules *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416 (1972), which precluded a . . . trustee from enforcing a claim on behalf of debenture holders against an indenture trustee for misconduct. The trustee is permitted to act as a class representative under this provision [under certain conditions]. . . . A judgment in the action binds all creditors . . . that could have brought the action, and the court may stay the commencement or continuation of any other action on the same cause of action. All creditors that could have brought the action are given notice of the trustee's suit, and nothing precludes such creditors from retaining their own attorneys and joining the action in their own behalf.

H.R. Rep. 95-595, 95th Cong., 1st Sess. 370-71 (1977), 1978 U.S.C.C.A.N. 5787, 6326, 6327.

We can think of many arguments against allowing a trustee to usurp the claims of a bankrupt's non-cooperating creditors that do not counsel against permitting creditors to voluntarily transfer their claims to a trustee as part of a court-approved plan of reorganization or liquidation. There is no evidence to suggest the grounds on which proposed § 544(c) was actually rejected.[11] Because it is perfectly plausible that Congress intended to leave *Caplin* intact without expressing any view on *Barnes*, we disagree with Appellees that Congress's rejection of § 544(c) fatally undermines the reasoning of *Semi-Tech*.

Second, Appellees argue that "the First Department's decision in *Semi-Tech* carries only modest weight as a predictor of New York law because it conflicts with the Second Department's

---

[11] The only mention of § 544(c)'s rejection is contained in a joint explanatory statement between the House of Representatives and the Senate regarding provisions of the Code that were amended in the process of creating a compromise bill between the houses of Congress: "The House amendment deletes section 544(c) of the House bill." 124 Cong. Rec. 11,097 (Sept. 28, 1978).

decision in *P&F*." As we have already noted, however, Appellees point to no state law bar to the assignment of the TCW claims to BSI. Thus, to the extent that Appellees ask us to interpret federal law to bar such an assignment, a conflict between New York courts on the issue, while potentially informative, is not determinative.

In any event, Appellees misread *P&F*, which did not involve an assignment of claims from a debtor's creditor to a bankruptcy trustee. In *P&F*, a bankruptcy trustee unsuccessfully asserted claims against three defendants for fraudulently disguising a loan to the bankrupt as secured debt in order to give themselves an unfair advantage over the bankrupt's general creditors in bankruptcy proceedings. *P&F*, 102 A.D.2d at 866. One of the bankrupt's creditors, P&F, sued the same three defendants for tortious interference with its contract with the bankrupt. *Id.* The defendants moved for summary judgment against P&F on the grounds that the trustee had already unsuccessfully litigated the same claim. *Id.* The Second Department reversed the trial court and denied the defendants' motion even though they agreed that P&F's tortious interference claim was premised on largely the same conduct as the bankruptcy trustees' fraud claim. *See id.* The court explained:

> The fact that the trustee in bankruptcy unsuccessfully litigated the issue of whether the 1976 loan transactions . . . were fraudulent as to [bankrupt's] general creditors does not preclude plaintiff from asserting that defendants tortiously interfered with its contract with [the bankrupt]. This claim was personal to plaintiff. It was not an asset of [the bankrupt's] before it was bankrupt or of its estate while it was in bankruptcy. It therefore could not have been asserted by the trustee in bankruptcy.

*Id.* at 866-67 (internal citations omitted). Thus, *P&F* held that a bankruptcy trustee cannot assert the non-assigned claims of a bankrupt's individual creditors, because such claims are not part of the bankrupt's estate. That holding does not conflict with *Semi-Tech*'s holding that a trustee may

-41-

assert claims assigned to it by a bankrupt's creditors for the benefit of the estate, because those claims can become property of the estate under § 541(a)(7).

Allowing a debtor's creditors to assign their claims for the benefit of the debtor's estate permits debtors, creditors, and bankruptcy courts the flexibility in reorganizing or liquidating a debtor's assets necessary to achieve efficient administration of the reorganization or liquidation. Indeed, the voluntary and court-approved assignment at issue in this case perfectly illustrates how both a debtor and its creditors can benefit from the flexibility that § 541(a)(7) of the Bankruptcy Code facilitates. The *Barnes* view would unnecessarily hamstring those parties on the basis of an outdated version of the Bankruptcy Code. Because neither of Appellees' arguments convince us otherwise, we hold that BSI has standing to assert the TCW claims against E&Y.

**III.**

Because we have found that BSI has standing to assert both the CBI and the TCW claims against E&Y, we must reach the two arguments that Appellees press on cross-appeal. We first answer the question: Are the CBI and TCW claims "core proceedings" that may be tried by a bankruptcy judge?

The distinction between "core" and "related" matters in the context of bankruptcy (or "title 11") proceedings can be traced back to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), and is now codified at 28 U.S.C. § 157(b). In *Marathon*, the plurality opinion held that a non-Article III bankruptcy judge could not adjudicate a pre-petition contract dispute arising under state law against a party that had not filed a proof of claim and was not otherwise related to the bankruptcy proceedings. The plurality explained that "Article III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to

those arising under the bankruptcy laws," 458 U.S. at 75, and it distinguished between "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power," and "the adjudication of state-created private rights, such as the power to recover contract damages," *id.* at 71. In response to the Court's decision, Congress enacted 28 U.S.C. §157, authorizing district courts to refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11" to bankruptcy judges under subsection (a), and defining the reach of the bankruptcy court's power under subsections (b) and (c). *See Arnold Print Works, Inc. v. Apkin* (*In re Arnold Print Works, Inc.*), 815 F.2d 165, 166-67 (1st Cir. 1987) (Breyer, *J.*) (describing the history of 28 U.S.C. § 157). Subsection (b) provides that bankruptcy judges may "hear and determine all cases under title 11 and all *core* proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1) (emphasis added). Subsection (c) provides that bankruptcy judges "may hear a proceeding that is not a core proceeding but that is otherwise *related* to a case under title 11," but may only "submit proposed findings of fact and conclusions of law to the district court" on such matters. *Id.* § 157(c)(1) (emphasis added). In such a case, "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." *Id. But see Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1101 (2d Cir. 1993) (holding that "[r]elated" proceedings in which the parties are entitled to a jury trial must be tried in district court).

A bankruptcy court's power to "enter appropriate orders and judgments" in a given bankruptcy proceeding therefore hinges on whether the proceeding is "core" or "related," *see* 28

U.S.C. §§ 157(b)(1), (c)(1), consistent with the constitutional limits that Marathon established. *See S.G. Phillips Constructors, Inc. v. City of Burlington* (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 705 (2d Cir. 1995). Section 157 does not define "core proceeding." Instead, it contains a non-exhaustive list of core proceedings, 28 U.S.C. § 157(b)(2), relevantly including: matters affecting the "allowance or disallowance of claims against the estate," § 157(b)(2)(B); and "counterclaims by the estate against persons filing claims against the estate," § 157(b)(2)(C). Appellees dispute the district court's holding that all of the claims asserted by BSI are core proceedings as defined by § 157(b)(2)(B) and/or (C). Appellees contend, on the contrary, that both the CBI claims and the TCW claims are related proceedings that must be tried by a district court judge. We disagree. Because all of the claims asserted by BSI are covered by the language of 28 U.S.C. § 157(b) and are integrally related to the Proof of Claim that E&Y voluntarily submitted against the estate, they are core proceedings triable by a bankruptcy judge.

## A.

In crafting § 157, "Congress realized that the bankruptcy court's jurisdictional reach was essential to the efficient administration of bankruptcy proceedings and intended that the 'core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in *Marathon*." *S.G. Phillips Constructors*, 45 F.3d at 705. Both this Court and the Supreme Court have honored that intention by "conclud[ing] that the *Marathon* holding was a narrow one and . . . [by] broadly constru[ing] the jurisdictional grant" to bankruptcy courts contained in § 157(b). *Id*; *see also U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n* (*In re U.S. Lines, Inc.*), 197 F.3d 631, 637 (2d Cir. 1999) ("'[C]ore proceedings' should be given a broad interpretation that is 'close to or congruent with constitutional limits.'"). All of the CBI

claims are explicitly core under the language of § 157(b), because they either affect the "allowance or disallowance of [a] claim[] against the estate," 28 U.S.C. § 157(b)(2)(B), are "counterclaims by the estate against persons filing claims against the estate," *id.* § 157(b)(2)(C), or both.

CBI's claim for expungement of E&Y's Proof of Claim is unquestionably a core proceeding; it directly affects the allowance of E&Y's claim against CBI's estate. *See* 28 U.S.C. § 157(b)(2)(B); *S.G. Phillips Constructors*, 45 F.3d at 705 ("Nothing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor."); *see also Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1389-90 (2d Cir. 1990). Similarly, insofar as CBI's claims for fraud (both as to performance of the audits and inducement to perform the re-audit), negligence and breach of contract are related to the "professional services rendered in 1993 and 1994 on behalf of [CBI] in connection with the audit of [CBI]'s financial statements and other special engagements" for which E&Y seeks compensation via its Proof of Claim, they too are core.[12] "[M]alpractice is a defense to an action to recover for professional services" under New York law. *Altamore v.*

---

[12] It is not clear precisely to what extent BSI's fraud, negligence and breach of contract claims are direct defenses to E&Y's Proof of Claim, because – as noted by the district court – it is not clear what accounting services are covered by E&Y's fees claim. *See CBI II*, 311 B.R. at 362 n.4. By its terms, the Proof of Claim covers services rendered in 1993 and 1994. If it does, then insofar as CBI's claims allege fraud, negligence and/or breach of contract with regard to either the 1993 audit or the 1994 re-audit, the claims are direct defenses to E&Y's fees claim. However, the exhibits attached to E&Y's Proof of Claim, which purport to detail the services for which payment is owed, contain only invoices from 1994. If E&Y's fees claim only relates to the re-audit, then CBI's claims are only direct defenses insofar as they implicate the re-audit. However, we need not determine the precise scope of E&Y's fees claim, because all of the CBI claims are counterclaims to the fees claim and thus core proceedings under 28 U.S.C. § 157(b)(2)(C). *See infra*.

-45-

*Friedman*, 193 A.D.2d 240, 247 (2d Dep't 1993).  Likewise, "if by misrepresentation . . . , the plaintiffs were induced to enter into the agreement in suit, . . . the defendant has . . . forfeited all right to compensation for services rendered." *Bowen v. Merdinger*, 196 Misc. 987, 991 (N.Y. Sup. Ct. 1949).  As defenses to E&Y's fees claim, these CBI claims also directly affect the allowance of that claim.  "Proceedings can be core by virtue of their nature if . . . the proceedings directly affect a core bankruptcy function." *U.S. Lines*, 197 F.3d at 637 (citation omitted); *S.G. Phillips Constructors*, 45 F.3d at 705 (holding that proceedings that affect the allowance of a claim are core).  All of these claims affect one of the most elemental of all core bankruptcy functions:  determining if a creditor may collect from a debtor's estate.

We agree with the district court that because "CBI's remaining claims of negligence, breach of contract, and fraud are based upon the same operative facts as" the above core proceedings "and were filed in response to [E&Y's] Proof of Claim, which is based on the same set of facts, those claims are also . . . core." *CBI II*, 311 B.R. at 363.  "A response to a proof of claim which is, in essence, a counterclaim, is a core proceeding under 28 U.S.C. § 157(b)(2)(C)." *Bank of Lafayette v. Baudoin* (*In re Baudoin*), 981 F.2d 736, 741 (5th Cir. 1993) (holding that debtor's contract and tort claims regarding loans were "core" when creditor filed proof of claim based on same loans).

Appellees direct us to our decision in *Orion Pictures*, which they argue suggests that even where a claim arguably falls within the language of one of § 157(b)(2)'s broad provisions, it may still not be core within the limits of *Marathon*.  *See Orion Pictures*, 4 F.3d at 1102 ("The problem . . . is that it creates an exception to *Marathon* that would swallow the rule.  Any contract action that the debtor would pursue against a defendant presumably would be expected to inure to the

benefit of the debtor estate and thus 'concern[s]' its 'administration'" under § 157(b)(2)(A). (alteration in original)).[13] However, even if not all claims that fall within the "core" categories designated by § 157(b)(2)(B) and (C) would fall within the constitutional limits that *Marathon* identified, CBI's claims are so factually and legally interconnected with E&Y's fees claim against the estate, as well as with CBI's primary defenses to that claim, that their designation as core does not breach those limits. *See U.S. Lines*, 197 F.3d at 637 (recognizing "the degree to which the proceeding is independent of [debtor's] reorganization" to be relevant to its core status post-*Marathon*); *see also Manville*, 896 F.2d at 1390 (holding that party who filed a proof of claim against the debtor was, unlike the defendant in *Marathon*, not "a third party related only peripherally to the adjudication of [the debtor's] estate" and "[t]he determination of the objection to and allowance of its claim is clearly within the traditional core jurisdiction of the bankruptcy court"); *Resolution Trust Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*), 68 F.3d 26, 32 (2d Cir. 1995) ("Unlike a proceeding that simply seeks to augment the estate, the present proceeding involves the priority rights of creditors who have filed claims against the estate."). Moreover, "[w]e do not think that anything in *Marathon* alters the basic principle that the filing of a proof of claim invokes the special rules of bankruptcy . . . ." *S.G. Phillips Constructors*, 45 F.3d at 706 (internal quotation marks omitted).

---

[13] Appellees raise this claim specifically in response to the district court's holding that all of the CBI claims also fall under the "catch-all" provisions of 28 U.S.C. § 157(b)(2): (A) ("matters concerning the administration of the estate") and (O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims"). We express no opinion on that holding. The two provisions under which we find the CBI claims to be core – § 157(b)(2)(B) and (C) – are not as broadly worded.

Appellees also contend that none of CBI's claims can be deemed core on the basis that they affect the allowance of E&Y's Proof of Claim, because as objections to that claim they would be time-barred under the Plan. The parties agree that the Plan set a "bar date" of December 1, 1995 for filing objections to creditors' claims and that the Creditors' Committee timely filed an objection to E&Y's Proof of Claim, which it later assigned to BSI. However, E&Y alleges that the initial objection filed by the Creditors' Committee only referenced the "excessive" amount of E&Y's claim, and argues that the Creditors' Committee could not amend that objection to assert new claims against E&Y after the bar date passed (*e.g.*, for malpractice).

E&Y offers no authority for its contention that once an objection to a proof of claim is made, it can never be amended after the bar date.[14] Nor do Appellees explain why a claim must be "an objection" to a creditor's claim against an estate in order to qualify as a core proceeding affecting the allowance of such a claim under 28 U.S.C. § 157(b)(2)(B). However, even if we accepted Appellees' argument *arguendo*, it would not affect our holding that all of the CBI claims are core. The Plan's bar date did not apply to counterclaims filed in an adversary proceeding. All of the CBI claims are interconnected with E&Y's fees claim. Thus, all of the CBI claims are counterclaims against E&Y and core pursuant to § 157(b)(2)(C). *See Baudoin*, 981 F.2d at 741.

Appellees also argue that the CBI claims cannot be deemed core, because CBI's $45 million in claims arise under state law, would exist even if CBI had not gone bankrupt, and are disproportionate to E&Y's $210,850 fees claim. Appellees derive the rule on which they base this

---

[14] Indeed, the only authority Appellees purport to cite for their contention, 9 Collier on Bankruptcy ¶ 3001.04[1] (15th ed. 2005), refers solely to post-bar date amendments to *proofs of claim* – as opposed to to *objections* thereto – in the referenced language.

argument – that, "counterclaims based on state law causes of action that would exist independently of a bankruptcy and are disproportionate to the proof of claim can never be treated as core" – from two cases: *Complete Management v. Arthur Andersen, LLP* (*In re Complete Management, Inc.*), 02-CIV-1736, 2002 WL 31163878 (S.D.N.Y. Sept. 27, 2002) and *Marshall v. Marshall* (*In re Marshall*), 264 B.R. 609 (C.D. Cal. 2001). Neither binds us. Moreover, neither actually stands for Appellant's rule, which we decline to adopt.

In *Complete Management*, the debtor's auditor, Arthur Andersen, asserted a proof of claim against the debtor in bankruptcy court for professional services rendered. 2002 WL 31163878, at *1. In response, debtor filed an adversary proceeding in bankruptcy court against Arthur Andersen alleging malpractice, and Arthur Andersen moved in district court to withdraw the proceeding from bankruptcy court under 28 U.S.C. § 157(d). *Id.* That provision permits a district court to "withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). In deciding whether to grant the motion to withdraw, the district court considered a number of factors, including whether the malpractice claim was "core" (which, if it were, would weigh against withdrawal). *Complete Mgmt.*, 2002 WL 31163878, at *2. Appellees claim that "the court held that core status does not 'extend[] to a counterclaim that is, as here, seventy times greater than the proof of claim.'"[15] That is, however, a mischaracterization of *Complete Management*'s holding.

---

[15] Another difference between *Complete Management* and the instant case is that the plaintiffs in *Complete Management* argued principally that their claims were core under 28 U.S.C. § 157(b)(2)(O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims").

To be sure, the district court in *Complete Management* did seem to think that the size of the debtor's counterclaim distinguished that case from others.[16] 2002 WL 31163878, at *3. However, the court did not hold that the counterclaim was non-core on that basis alone, but explained that even if the counterclaim was "technically a core proceeding," other factors weighed in favor of *discretionary* withdrawal. *Id.* Ultimately, even under a reading of *Complete Management* favorable to Appellees, the case does not create a rule that the sort of counterclaim at issue in this case can never be core.

*Marshall* involves a proof of claim and an adversary proceeding filed by Pierce Marshall in the bankruptcy of his step-mother, Vickie Lynn Marshall (aka Anna Nicole Smith). *Marshall*, 264 B.R. at 616. Pierce alleged that Vickie defamed him when some of her lawyers told members of the press that he used forgery, fraud and overreaching to gain control of his father's assets. *Id.* Vickie counterclaimed, alleging that Pierce tortiously interfered with her expectation of an *inter vivos* gift from her since-deceased husband. *Id.* at 617. The bankruptcy court found that Vickie's counterclaim was core and Pierce disputed that finding on appeal. *Id.* at 625. While it is true, as

---

[16] Indeed, the quotation from which Appellees excerpt *Complete Management*'s holding reads, in full:

> There is some case law support for [debtor's] position that, since Andersen filed a proof of claim against the estate of [debtor] in the Bankruptcy Court, the adversary proceeding by [debtor] against Andersen for negligence in performing its audit work for [debtor] is a counterclaim, and therefore a core proceeding. However, while the cases speak of the filing of a proof of claim subjecting the claimant to the equitable jurisdiction of the Bankruptcy Court, no case has suggested that the equitable jurisdiction extends to a counterclaim that is, as here, seventy times greater than the proof of claim.

2002 WL 31163878, at *3 (internal footnote omitted).

Appellees argue, that the district court noted that Vickie's claim "dwarf[ed] Pierce's defamation [claim] in all respects, both in terms of the time and effort spent litigating it and the size of the potential judgment," the court's reversal of the bankruptcy court rested on a number of factors – particularly, the "attenuated" nexus between the transactions out of which Pierce's claim and Vickie's counterclaim arose, and the "entirely different" issues of law raised by the two claims. *Id.* at 631-32. Because *Marshall*'s holding rested on "the unique characteristics and context of [Vickie's] counterclaim," it cannot be read as standing for the general rule that the sort of counterclaim at issue in this case can never be core. *Id.* at 632. Moreover, because CBI's claims against E&Y unquestionably share a common transactional nexus with, and raise similar issues of law to, E&Y's Proof of Claim, *Marshall*'s context-specific holding is inapposite here.[17]

**B.**

The TCW claims are in a slightly different posture than the CBI claims; none of them affect the allowance of E&Y's fees claim against the estate. Nonetheless, the TCW claims qualify as core under the language of § 157(b)(2)(C), because they are "counterclaims by the estate against persons filing claims against the estate." After *Marathon*, "[p]roceedings can be core by virtue of their nature if . . . the type of proceeding is . . . uniquely affected by the bankruptcy proceedings." *U.S. Lines*, 197 F.3d at 637. Here, the TCW claims are related to and arise out of the same transaction as E&Y's fees claim, and a determination on the TCW claims would likely be dispositive of E&Y's claim. Similarly, a decision by the bankruptcy court on E&Y's claim or the CBI claims would resolve many of the factual and legal issues involved in the TCW claims,

---

[17] Whether Vickie's counterclaim is core is still an open question before the Ninth Circuit. *See Marshall v. Marshall*, 547 U.S. 293, 315 (2006).

including the central issue: Whether E&Y committed fraud, or was reckless and/or negligent, in connection with its audits of CBI. Thus, we have no trouble concluding that the TCW claims are core.

Appellees argue that the TCW claims should not be deemed core as a matter of policy. They warn of the "perils of affording core status to claims asserted on behalf of persons or entities other than the debtor." Specifically, Appellees point to the risk of "jurisdiction by assignment" in violation of 28 U.S.C. § 1359,[18] whereby "third-party litigation could routinely be transformed into a core bankruptcy proceeding simply by assigning the claim to the estate."[19] Appellees' policy concern might be valid in theory, but there is no evidence that the assignment in this case was made for the purpose of manufacturing the bankruptcy court's jurisdiction. Indeed, as the district court noted, the assignment here "was effected as an integral part of the Plan, which was approved by the bankruptcy court." *CBI II*, 311 B.R. at 364.

[18] Section 1359 provides that: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

[19] Appellees also cite to *131 Liquidating Corp. v. LaSalle Capital Group, Inc.* (*In re 131 Liquidating Corp.*), 222 B.R. 209 (S.D.N.Y. 1998) in support of their argument. E&Y asserts that the case stands for the proposition that the fact that a claim arises out of the same transaction as core claims does not necessarily "render[] the claim core." Whether or not that is an accurate reading of *131 Liquidating*, the case does not resemble the factual context of this case. *See* 222 B.R. at 212. In *131 Liquidating*, the district court found that a claim brought by the debtor and its shareholders against three individual principals of one of the debtor's creditors was not core. *Id.* at 211. However, those principals had not filed a proof of claim against the estate, nor (according to the district court) did the claims against them qualify as core under any of the express provisions of § 157(b)(2). *Id.* at 211-12. In this case, the TCW claims are core under the language of § 157(b)(2)(C). That conclusion does not contravene the limits of *Marathon* because TCW's claims are integrally related to the core bankruptcy proceedings. We express no judgment on the question of when, if ever, a claim that does not qualify as core under § 157(b)(2)'s express language could be rendered core only on the grounds that it is based on the same transaction as a core proceeding.

Thus, we hold that the bankruptcy court had jurisdiction to try both the CBI claims and the TCW claims, because they are both core proceedings.

## IV.

That leaves the last line of defense raised in Appellees' cross-appeal: Were Appellees' Seventh Amendment rights violated when they were not afforded a jury trial on the CBI claims?

The Seventh Amendment protects the right to a jury trial only for matters at law, "in contradistinction" to those in equity. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989); *see also* U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."). In evaluating whether E&Y had a jury trial right to adjudication of CBI's claims, "[w]e are required to analyze the underlying nature of the claim without regard to Congress' designation of that claim as core." *Ben Cooper, Inc. v. Ins. Co. of the State of Pa.* (*In re Ben Cooper, Inc.*), 896 F.2d 1394, 1401 (2d Cir. 1990), *vacated and remanded on other grounds*, 498 U.S. 964 (1990), *reinstated at* 924 F.2d 36 (2d Cir. 1991). Generally, our inquiry under *Granfinanciera* proceeds in two steps. "First, we ask whether the action would have been deemed legal or equitable in 18th century England. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005) (internal quotation marks and citations omitted).

There is no question that, outside of the bankruptcy context, CBI's first through fifth

claims,[20] and all of the TCW claims, are legal in nature. Appellees also do not appeal from the district court's decision that E&Y is entitled to a jury trial with regard to the TCW claims. However, *Granfinanciera* and *Langenkamp v. Culp*, 498 U.S. 42 (1990) (per curiam), also recognized that "by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claim,' thereby subjecting himself to the bankruptcy court's equitable power." *Langenkamp*, 498 U.S. at 44 (construing *Granfinanciera*, 492 U.S. at 58-59). If the bankruptcy trustee responds by filing its own claim against the creditor that would eliminate the basis for the creditor's claim, those two claims "become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction. As such, there is no Seventh Amendment right to jury trial." *Id.* at 44-45. Thus, the question in this case is whether, by filing its proof of claim against the debtor, Appellees submitted themselves to the jurisdiction of the bankruptcy court for CBI's claims asserted in response to that claim because resolution of those claims became integral to restructuring the debtor-creditor relationship. We hold that it did. Appellees contend that, in the alternative, their "conceded entitlement to a jury trial on the TCW claims requires that the CBI portion of the judgment be vacated" under the rule of *Lytle v. Household Manufacturing Inc.*, 494 U.S. 545 (1990). Because Supreme Court case law instructs that *Lytle* does not apply in the context of bankruptcy, we disagree. *See Katchen v. Landy*, 382 U.S. at 323.

**A.**

Filing a proof of claim against a bankruptcy estate triggers the process of "allowance and

---

[20] The only claim that sounds solely in equity is CBI's claim for the expungement of E&Y's Proof of Claim.

disallowance of claims," and, therefore, a creditor who files such a claim subjects itself to the bankruptcy court's equitable jurisdiction in proceedings affecting that claim. *Granfinanciera*, 492 U.S. at 58. In *Langenkamp*, the Supreme Court held that if a creditor who has filed such a claim is met with an adversary proceeding, the resolution of which affects the equitable restructuring of debtor-creditor or creditor-creditor relations, then the creditor loses its right to a jury trial even with regard to traditional legal claims. *See* 498 U.S. at 44; *Granfinanciera*, 492 U.S. at 58-59 & n.14. As we recognized in *Germain v. National Bank*, 988 F.2d 1323 (2d Cir. 1993), filing a proof of claim is a necessary but not sufficient condition to forfeiting a creditor's right to a jury trial. *See id.* at 1327. Rather, a creditor loses its jury trial right only with respect to claims whose resolution affects the allowance or disallowance of the creditor's proof of claim or is otherwise so integral to restructuring the debtor-creditor relationship. *Id.* That E&Y waived its right to a jury trial with regard to the CBI claims by filing its Proof of Claim follows directly from this decision: E&Y filed a proof of claim against CBI; the CBI claims were asserted in response to that proof of claim; and, insofar as we have already held that the CBI claims are either defenses to E&Y's fees claim or integrally related to those defenses, the resolution of the CBI claims clearly affects the structuring of the debtor-creditor relationship between CBI and E&Y.

Notwithstanding *Langenkamp*, Appellees contend that under this Court's decision in *Germain*, a creditor does not lose its jury trial rights as to debtor-asserted counterclaims based on "actions that are neither in violation of nor in compliance with the Bankruptcy Code, but are independent of and outside the reach of the bankruptcy process." *Germain*, 988 F.2d at 1328. In *Germain*, a creditor filed a proof of claim against the debtor in a bankruptcy proceeding. *Id.* at 1325. Six months later, the debtor commenced a suit in state court against the creditor, and the

creditor subsequently removed the action to bankruptcy court. *Id.* The debtor's suit claimed that the creditor had used its power as the debtor's primary lender to exercise control of the debtor to its detriment and alleged that this conduct constituted tortious interference with the debtor's business, coercion and duress, breach of good faith, unfair business practices, and misrepresentation. *Id.* at 1326. The *Germain* Court characterized the action at issue as "'quintessentially [a] suit[ ] at common law that more nearly resemble[s] state-law contract [and tort] claims brought by a bankrupt corporation to augment the bankruptcy estate than [it does] creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res,'" and, on that basis, found that the debtor was entitled to a jury trial because the debtor's claims retained their "legal" nature. *Id*. at 1328 (quoting *Granfinanciera*, 492 U.S. at 56) (alterations in original). Thus, Appellees argue that because the *Germain* Court's characterization of the debtor's claims also applies to CBI's claims, E&Y is entitled to a jury trial under *Germain*.

Appellees' argument is unpersuasive because the relationship between the creditor's and debtor's claims in *Germain* is materially different than that between CBI's and E&Y's claims here. In particular, the debtor's claims in *Germain* were not asserted to counter the proof of claim that the creditor filed in its bankruptcy proceedings. *Id*. at 1325. Indeed, the debtor in *Germain* did not object to the creditor's proof of claim, which was based entirely on pre-bankruptcy business dealings between the debtor and creditor. *Id.* Rather, the debtor commenced independent litigation in state court six months later solely directed at the creditor's conduct after the debtor filed for bankruptcy. *Id.* The only reason the debtor's claims ended up in bankruptcy court was because the creditor removed them from state court. *Id.* Thus, resolution of the debtor's claims in *Germain* would not affect the equitable restructuring of the debtor-creditor

relationship in debtor's bankruptcy proceeding. By contrast, here, the CBI claims were asserted in the bankruptcy proceedings to counter E&Y's Proof of Claim, and their resolution would directly affect the bankruptcy court's equitable restructuring of the debtor-creditor relationship. Indeed, the *Germain* Court explicitly distinguished this type of a situation – where the action in which a jury trial is sought is actually part of the claims-allowance process:

> A different result might adhere if the action had become part of the claims-allowance process . . . . An action that bears directly on the allowance of a claim is integrally related to the equitable reordering of debtor-creditor and creditor-creditor relations. If an equitable reordering cannot be accomplished without resolution of what would otherwise be a legal dispute, then that dispute becomes an essential element of the broader equitable controversy.

*Id*. at 1329 (internal citation omitted). Therefore, *Germain* does not alter the well-established principle that Appellees are not entitled to a jury trial on the CBI claims that are integral to, and directly affect the allowance of, the proof of claim they filed with the bankruptcy court.

**B.**

Lastly, Appellees contend that even if this Court finds that E&Y is not entitled to a jury trial on the CBI claims, E&Y is still entitled to vacatur of the portions of the bankruptcy court's judgment that relate to the CBI claims under *Lytle*. *See* 494 U.S. at 550-52. In *Lytle*, the Supreme Court held that when a trial court erroneously dismisses the legal – and therefore jury-triable – claims in a case involving legal and equitable claims with common issues of fact, and then goes on to rule on the remaining equitable claims, the court's judgment must be vacated in full because the parties are entitled to have a jury decide the claims' common issues of fact under the Seventh Amendment. *Id*. at 555, 556 n.4. Appellees contend that the basic principle on which *Lytle* is based – that parties are entitled to have factual issues in legal claims resolved by a jury in the first

instance – is applicable here. Appellees point to the issues of fact common to the CBI and TCW claims that were resolved by the bankruptcy court's judgment (*e.g.*, whether E&Y is guilty of fraud, recklessness and/or negligence), and argue that because it is now undisputed that E&Y is entitled to a jury trial on the TCW claims, it is also entitled to *Lytle*'s remedy of vacatur.[21]

Both parties agree that if *Lytle* applies to this case, it would require vacatur of the bankruptcy court's judgment. However, under the Supreme Court's decision in *Katchen*, the *Lytle* rule does not apply in the context of bankruptcy proceedings. *See Katchen*, 382 U.S. at 338-39. In *Katchen*, the Supreme Court held that it was permissible for a bankruptcy court to hold a bench trial on an equitable claim, even if its judgment would have res judicata effect on factual issues common to a jury triable legal claim, without violating the Seventh Amendment. *Id. Katchen* thus rejects the *Lytle* principle that parties are entitled to have the factual issues underlying their legal claims heard by juries in the first instance, and its correlative remedy of stay or vacatur, in the bankruptcy context.[22] Therefore, not only is E&Y not entitled to vacatur of the portions of the bankruptcy court's judgment that relate to the CBI claims, but to the degree that the court's judgment on those claims is dispositive of factual issues underlying the TCW claims, E&Y may

---

[21] As previously noted, the district court's holding that E&Y is entitled to vacatur of the portions of the judgment that relate only to the TCW claims is not at issue in this appeal.

[22] A federal court, or a state court for that matter, cannot ordinarily preempt a defendant's Seventh Amendment rights by deciding factual issues on equitable claims that are common to legal claims while reserving those legal claims for a later jury trial. That would indeed constitute a right with no real remedy. However, when one steps into Bankruptcy Court, one knows the rules of engagement on a proof of claim and the defenses thereto. They do not include a right to a jury trial.

also be collaterally estopped from relitigating those issues at its jury trial on the TCW claims.[23]

Appellees do not dispute that if *Katchen* applies here, E&Y is not entitled to vacatur under *Lytle*. Instead, Appellees allege that *Katchen* is no longer good law, because it "is an artifact of the archaic scheme of the Bankruptcy Act of 1898, in which certain claims could not be tried in federal court, but instead [had] to be tried via a separate 'plenary' suit in state court (absent a non-bankruptcy basis for federal jurisdiction)." Appellees explain that "[i]t was against this background of delay and expense resulting from having to wait for trial of the plenary action in a separate tribunal that the *Katchen* Court concluded that the equitable proceedings . . . could go first." Appellees argue that because the Bankruptcy Code of 1978 eliminated this need for delay by giving federal courts jurisdiction over all claims arising in the context of bankruptcy proceedings, the *Katchen* rationale for abrogating *Lytle* in the context of bankruptcy has been eliminated.

Appellees' reasoning might very well be sound, but to no avail. This Court does not have the discretion to ignore Supreme Court precedent simply because the reasoning on which it is premised may seem no longer viable. The Supreme Court has explicitly stated that if its precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989); *see also Bach v. Pataki*, 408 F.3d 75, 86 (2d Cir. 2005). Moreover, *Katchen*'s relevant holding has been repeatedly reaffirmed after the

---

[23] The preclusive effect of the bankruptcy court's judgment depends on other legal considerations, which we need not explore here.

Bankruptcy Code of 1978's enactment by both the Supreme Court, *see, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 334-35 (1979), and this Court, *see, e.g.*, *Agudas Chasidei Chabad v. Gourary*, 833 F.2d 431, 438 (2d Cir. 1987). Thus, at least until the Supreme Court holds otherwise, *Katchen* is still good law and Appellees are not entitled to relief under *Lytle.* Therefore, the portions of the bankruptcy court's judgment related to the CBI claims need not be vacated.

**CONCLUSION**

We reject both of Appellees' challenges to BSI's standing to assert the CBI and TCW claims. CBI management's role in defrauding the company's creditors is not a bar to BSI asserting the company's claims against its former accountant, because the bankruptcy court's finding that management had "totally abandoned" the company's interests was not clearly erroneous. The rights of a trustee to accept and protect property after the commencement of bankruptcy proceedings is an issue of federal bankruptcy law; § 541(a)(7) of the Bankruptcy Code permits a trustee (or equivalent) to assert claims against a third party that were assigned to the trustee by a creditor of the bankrupt whose shoes it fills. Similarly, we reject both of the challenges that Appellees press to the venue and manner in which BSI chooses to assert its claims. The CBI and TCW claims are all core proceedings that may be tried in a bankruptcy court. The CBI claims may be tried without a jury and before any claims that require a jury trial.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED to the district court for proceedings in accordance with this decision.